# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER GASSEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-01663-JAR |
| | ) | |
| PAUL JONES, MD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant Paul Jones, M.D.'s ("Defendant") Motion

for Summary Judgment (Doc. 54). Plaintiff has responded (Doc. 60), Defendant has replied

(Doc. 61), and Plaintiff has filed a sur-reply (Doc. 62) and another memorandum in opposition

(Doc. 69). For the following reasons, the Court will grant Defendant's Motion.

## I.      Background

On October 24, 2016, Plaintiff, an inmate in the custody of the Missouri Department of

Corrections ("MDOC"), filed this action under 42 U.S.C. § 1983 (Doc. 1). His complaint, as

amended and as relevant, alleges that Defendant, a physician employed by Corizon Medical

Services ("Corizon"), was deliberately indifferent to his serious medical needs by failing to treat

him for a neck injury he suffered in November 2014 (Doc. 4).[1] More specifically, Plaintiff

claims that Defendant refused to treat him on June 25, 2014; September 25, 2014; October 3,

2014; October 10, 2014; and November 13, 2014 (*Id.* at 5-6). Plaintiff asserts that—between July

---

[1] Plaintiff also named Corizon as a defendant; however, on December 16, 2016, the Court
dismissed Plaintiff's deliberate-indifference claim against Corizon for failure to state a claim,
pursuant 28 U.S.C. § 1915(e)(2)(B) (Doc. 6).

16, 2014 and November 17, 2016—he self-declared medical emergencies several times because he was unable to raise his head without experiencing severe pain because "the dis[c]s of his spine [were] cutting into [his] spinal cord creating severe nerve damage" (*Id.* at 6). In addition, Plaintiff claims that a September 25, 2014, x-ray of his spine revealed that he urgently needed treatment, but Defendant refused to see him on September 30 (*Id.*). According to Plaintiff, on November 21, 2014, Corizon informed him that "if [he] wanted medical treatment to exhaust [his] grievance process" (*Id.*). Plaintiff underwent neck surgery in March 2015.[2] (*Id.* at 5). He claims that the delay in treatment caused him unnecessary pain, as well as severe and permanent nerve damage, physical disfigurement, and loss of muscle tone (*Id.* at 5-6). He seeks compensatory damages and an order requiring Corizon to provide him the medical treatments that his surgeon has recommended (*Id.* at 7).

Defendant previously moved for summary judgment on the ground that Plaintiff had failed to exhaust his administrative remedies pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) before bringing this action (Doc. 24). Thereafter, Plaintiff also moved for summary judgment, asserting that he is entitled to judgment on the merits because the undisputed medical evidence establishes that Defendant was deliberately indifferent to his medical needs (Doc. 34). The Court denied both motions (Doc. 39). Defendant now moves for summary judgment on the ground that the Plaintiff cannot demonstrate that Defendant was deliberately indifferent to his medical needs (Doc. 54).

II.    **Summary Judgment Standard**

_____

[2] In his amended complaint, Plaintiff indicates that he underwent surgery on March 30, 2014; however, it is apparent from the limited record before the Court that his surgery was performed in March 2015 (Docs. 25-2 at 16, 20, 23-24).

The Court may grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014). A moving party bears the burden of informing the Court of the basis of its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party discharges this burden, the nonmoving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. *Celotex*, 477 U.S. at 331. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### III.   Discussion

"An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Thus, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Id.* at 104 (citing *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Deliberate indifference claims have "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [he] suffered [from]

objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (alterations in original) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)). In order to state a cognizable claim, however, the prisoner must allege deliberate acts or omissions; "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106.

In his Motion for Summary Judgement, Defendant does not directly dispute that Plaintiff suffered from objectively severe medical conditions affecting his neck and back (Doc. 55 at 3, 8). Instead, Defendant argues that the medical records reflect extensive and diligent treatment of those conditions by him and others. (*Id*. at 3-10.) In his Complaint, Plaintiff asserts that he first reported his spinal conditions on June 24, 2014 (Doc. 4 at 5). Defendant asserts that, during a chronic care appointment on December 14, 2014, Plaintiff exhibited asymmetry in his left pectoralis musculature for the first time, and that Defendant immediately referred Plaintiff for an MRI that ultimately resulted in surgery (Doc. 55 at 7; *see also* Doc. 55-2 at 19). Plaintiff concedes that he ultimately received spinal surgery, but argues that Defendant refused to treat his condition in the intervening months and that the delay caused him unnecessary severe pain and resulted in permanent nerve damage and physical disfigurement (Doc. 4 at 5).

To succeed on a deliberate indifference claim premised on a delay in treatment, the prisoner "must present verifying medical evidence to show that the delay had detrimental effect." *Moots v. Lombardi*, 453 F.3d 1020, 1023 (8th Cir. 2006) (citing *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997)). The Court concludes that the undisputed record evidence illustrates a

history of consistent care provided by Defendant. Defendant's notes, corroborated by other providers, support his contention that Plaintiff did not exhibit a need for surgery before the December 14 appointment.

Defendant examined Plaintiff numerous times between June 24 and December 14, 2014. On July 14, 2014, Defendant noted normal musculoskeletal conditions and extremities (Doc. 55-2 at 42-43). Plaintiff was cleared for normal activity (*Id*. at 43). On July 21, 2014, Defendant noted no abnormalities in Plaintiff's health (*Id*. at 38-39). On July 23, and August 6, 2014, Plaintiff sought care from Defendant regarding a hernia (*Id*. at 40, 55-56). Defendant notes no complaints by Plaintiff regarding his back or neck (*Id*. at 40, 55-56). On October 3, 2014, Defendant was scheduled to examine Plaintiff but was unable to due to time constraints (*Id*. at 73). The appointment was rescheduled (*Id*.). One week later, on October 10, 2014, Plaintiff was seen by Defendant, complaining of restless leg syndrome and neck pain (*Id*. at 79-81). However, Plaintiff told Defendant that he had suffered from restless leg syndrome for years, and Defendant noted normal range of motion and no atrophy or asymmetry in the neck, chest, back, or arms that might indicate an emergent medical need (*Id*.). During an examination on November 12, 2014, a nurse noted that Plaintiff's left pectoral and arm were softer than those on his right and that Plaintiff did not lift his head (*Id*. at 90). The nurse indicated that he would discuss Plaintiff's condition with Defendant (*Id*.). According to Defendant, he was unaware of any "atrophy or physical deformity" when, on November 13, 2014, he instructed Plaintiff to continue with his course of care until his scheduled appointments in December (Doc. 55-1 at ¶ 15). Finally, on December 14, 2014, Defendant noted that Plaintiff's musculature and nerve function was irregular and ordered an MRI (*Id*. at 18-20).

On January 10, 2015, Defendant noted that Plaintiff's numbness and pain were progressing and that he was unable to do pushups (Doc. 55-2 at 99). Again, Defendant noted asymmetry in musculature and grip (*Id*.). Defendant referred Plaintiff to a neurosurgeon, placed him in a soft neck brace, and ordered that he be excused from work (*Id*.). Defendant notes that the asymmetry was new since he had last examined Plaintiff two months before (*Id*. at 100). On January 16, 2015, Defendant prescribed Nortriptyline for pain (*Id*. at 123). Defendant examined Plaintiff in the infirmary on January 19 and 20, 2015, noting no change to the treatment plan (*Id*. at 130, 133). On January 21, 2015, Defendant increased Plaintiff's pain medication dosage (*Id*. at 136). Defendant examined Plaintiff on January 22, 23, and 26, 2015, noting no significant changes (*Id*. at 139, 142-43, 150). Plaintiff underwent surgery on March 30, 2015.

Defendant's observations are corroborated by other providers who examined Plaintiff during the relevant time period. On June 24, 2014, a nurse noted that despite complaints of back pain, Plaintiff's gait was steady and he was able to bend forward at the waist without grimacing (Doc. 55-2 at 13). Throughout July 2014, Plaintiff was seen multiple times to deal with a hernia; the providers' notes indicate normal range of motion and no complaints regarding neck or back pain or abnormalities in his extremities (*See, e.g.*, *Id.* at 24-25, 29-60). On August 25, 2014, a nurse noted that Plaintiff complained of lower back pain, but again his gait and ability to bend forward were normal (*Id*. at 64-65). Six days later, on August 31, 2014, Plaintiff was again seen by a nurse for complaints of severe lower back pain, but the notes state no peripheral numbness, equal strength in his extremities, and a range of motion "within acceptable limits" (*id*. at 67).

On September 10, 2014, Plaintiff sought treatment for restless leg syndrome (*Id*. at 73). The nurse who treated him indicated that Plaintiff had "[n]o other complaints or concerns" (*Id*.).

On September 21, 2014, Plaintiff self-declared a medical emergency, telling the nurse "[I] have scoliosis and my left arm is cold and numb" (*Id*. at 74). The nurse indicated that movement and sensation in Plaintiff's extremities were intact (*Id*.). On September 24, 2014, Plaintiff was treated by a nurse for neck pain that "flared up about 4 days [before] while [Plaintiff] was working out and turned [his] head wrong" (*Id*. at 75). However, the treating nurse noted that another medical professional had observed Plaintiff in the waiting room just before his appointment, looking up to watch the TV (*Id*.). Likewise, when the nurse refused Plaintiff's request for an order exempting him from work, he left the clinic with his head held up (*Id*.). When Plaintiff self-declared another emergency on September 29, 2014, due to pain caused by asking someone to "crack [his] back" a week before, the nurse again noted that Plaintiff was "able to lift [his] head easily" and had normal range of motion (*Id*. at 76-77).

Plaintiff self-declared yet another medical emergency on October 7, 2014, telling the nurse that "his neck and neck muscles are 'killing him'" and that he had been dealing with persistent neck pain for three weeks that made standing too painful (*Id*. at 81). Although the nurse indicated a "muscle bulging to upper neck just below [Plaintiff's] skull," she also observed full range of motion, a steady gait, and equal grip in both hands (*Id*. at 82). The nurse instructed Plaintiff to return that afternoon but Plaintiff did not do so (*Id*.). Plaintiff was seen on October 28, 2014, complaining of back pain and numbness in his left arm (*id*. at 84-85), but after the nurse discharged him with instructions to continue the treatment plan prescribed by Defendant, Plaintiff sought no medical assistance for two weeks, suggesting the pain was either under control or less severe than described (*id*. at 87-88).

On November 12, 2014, Plaintiff's fiancée called to inform Corizon that Plaintiff needed

surgery and intended to sue (*Id*. at 87). The nurse who took the call told Plaintiff's fiancée that Plaintiff had not sought any medical attention since his October 28 appointment (*Id*.). Ninety minutes later, Plaintiff was seen by a nurse for complaints of back pain and left-sided weakness and numbness (*Id*. at 88-89). The nurse observed a knot at the base of Plaintiff's neck and Plaintiff refused to even try to bend forward or lift his head (*Id*. at 89-90). As noted above, the nurse also indicated that Plaintiff's left pectoral and arm were softer than those on his right (*Id*. at 90). However, on November 17, 2014, when Plaintiff sought a lay-in because he was switching jobs, Plaintiff asked for only a one-day reprieve, again suggesting the pain was not unbearably severe (Doc. 55-2 at 91-92). Plaintiff's fiancée called again on November 21, 2014 (*Id*. at 94). A nurse examined Plaintiff in response and observed that he had a stiff neck but noted normal arm movement, detected no difficulty picking up and holding his prison ID, and watched him "walking fast and without problem" as he left, showing no signs of acute distress or pain (*Id*.).

On December 10, 2014, Plaintiff was instructed to report to a nurse because he was not taking his prescribed medications (*Id*. at 95). When confronted, Plaintiff became agitated, asserting that the medications "don't work" (*Id*.). The nurse noted that throughout the encounter, Plaintiff "turned [his] neck freely, moved [his] arms normally, and gripped [medicine] cards and [his] ID [without] difficulty" (*Id*.). The nurse observed "[n]o facial grimacing, signs and symptoms of discomfort, or acute distress" (*Id*.) Plaintiff left the medical unit with a "brisk and stead" gait (*Id*.). Four days later, on December 14, 2014, Defendant diagnosed for the first time asymmetry in Plaintiff's neck, chest, and arms (*Id*. at 20).

The Court concludes that Plaintiff's medical record illustrates a thorough history of treatment by Defendant and includes no indication that he caused Plaintiff harm. That conclusion

is corroborated by other medical providers who treated Plaintiff. Despite the nurse's notation of left-sided softness on November 12 and 13, Plaintiff did not exhibit symptoms indicating a need for intervention during any of the multiple examinations by Defendant and others before the December 14 appointment. In short, there is no evidence to suggest that Defendant withheld or otherwise delayed medical treatment or that Plaintiff's alleged permanent medical issues were caused or exacerbated by Defendant's chosen course of care.

To the extent Plaintiff's complaint, read liberally, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), argues that Defendant's care was itself substandard or too conservative, or even that Defendant was negligent, he fails to state a claim under §1983. *Gibson v. Weber*, 433 F.3d 642, 646 (8th Cir. 2006) ("A showing of deliberate indifference is greater than gross negligence and requires more than mere disagreement with treatment decisions."); *Estelle*, 429 U.S. at 106.

**IV.    Conclusion**

The Court finds that there is no material issue of fact regarding Defendant's medical treatment of Plaintiff and that Defendant is entitled to judgment as a matter of law as to Plaintiff's claim of deliberate indifference.

Accordingly,

**IT IS HEREBY ORDERED** that Motion for Summary Judgment (Doc. 54) is **DENIED**.

An appropriate Judgment will accompany this Memorandum and Order.

Dated this 27th day of March, 2018.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE

9